STANLEY DUNN, ADMINISTRATOR, *vs.* JOHN A. MAC-DONALD, HIGHWAY COMMISSIONER OF THE STATE OF CONNECTICUT.

Third Judicial District, New Haven, June Term, 1929.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued June 13th—decided July 25th, 1929.

*James W. Carpenter*, for the appellant (defendant).

*William L. Hadden* and *William T. Holleran*, with whom, on the brief, was *Stanley Dunn*, for the appellee (plaintiff).

HAINES, J. The complaint in this action alleges, in effect, that on February 7th, 1928, the plaintiff's decedent, Catherine O. Barmmer of Bridgeport, was a passenger in an automobile driven by her husband upon the State trunk line highway between Beacon Falls and Naugatuck, and near midnight, when about half a mile south of Naugatuck Center, the automobile went through an aperture in the fence, over and down an embankment into the Naugatuck River, causing the death of the decedent by drowning; that this highway was under the care, control and supervision of the defendant State highway commissioner, and at the point

in question was in a slippery and dangerous condition
and not reasonably safe for travel; that the defendant
had failed to maintain a sufficient fence under the re-
quirements of the statute, but that it was in a broken
and dangerous condition and had been for a long
period, and as such had caused injury to persons travel-
ing upon the highway; that the defective condition of
both roadway and fence was known or should have
been known to the defendant, his servants and agents,
and that they had failed and neglected to remedy these
conditions, and no signs or warnings were given or
precautions taken to prevent injury to travelers from
such defective conditions. It was further alleged that
the decedent's injury and death were caused solely by
the "carelessness and negligence" of the defendant, his
servants and agents, and that the decedent was free
from contributory negligence.

The defendant met these allegations by a general de-
nial and without the interposition of a demurrer, mo-
tion for a more specific statement, or other pleading.
Upon this appeal from a plaintiff's judgment, the de-
fendant now argues that the complaint sounds in tort,
in whole or in part, and thus renders the judgment
void, because such an action does not lie against the
State, and that if the judgment is based upon the
statute, it is illegal as being outside the issues.

The complaint exhibits a failure to recognize clearly
the distinction which we have heretofore pointed out
between liability for damages from negligence, and lia-
bility for a penalty for breach of the statute. *Rogers* v.
*Meriden,* 109 Conn. 324, 146 Atl. 735; *Upton* v. *Wind-
ham,* 75 Conn. 288, 292, 53 Atl. 660. Since the de-
fendant chose to join issue without any attempt to
clarify the complaint, we must give it a reasonably
comprehensive construction in determining whether
the issues created by a general denial can support the

judgment. *Mezzi* v. *Taylor,* 99 Conn. 1, 9, 120 Atl. 871; *Simeoli* v. *Derby Rubber Co.,* 81 Conn. 423, 430, 71 Atl. 546; *Anderson* v. *United States Rubber Co.,* 78 Conn. 48, 52, 60 Atl. 1057; *Lovejoy* v. *Isbell,* 73 Conn. 368, 374, 47 Atl. 682; *Davis* v. *Guilford,* 55 Conn. 351, 354, 11 Atl. 350.

As thus construed, there can be found one issue as to whether the road was defective within the meaning of the statute, and a second as to whether the defendant maintained such a railing or fence' as the statute required. One or both of these issues, properly found for the plaintiff, must be held sufficient to support the judgment, whatever irrelevant matter may otherwise appear in the complaint. It is in fact to these two issues that the arguments and briefs of counsel are chiefly directed.

This appeal attacks five paragraphs of the finding on the ground that there is no evidence to support them. A thorough study of the record, however, discloses some evidence in support of each of these facts which are affirmatively found, while reasonable inference from other evidence, justifies all the facts not specifically testified to. The appellant desires that we add to the finding certain statements in the draft-finding, on the ground that they are supported by undisputed and admitted evidence. Our examination discloses that many of the statements thus sought to be added are not so supported; others are of no particular materiality in our view of the controlling questions raised by the appeal, and several of them are already contained in the finding as made by the trial court. The request for these corrections cannot be granted.

The more important of the facts disclosed by the finding are that the decedent was riding in a six-cylinder Nash Coach driven by her husband, between Beacon Falls and Naugatuck. Her husband was an ex-

perienced driver and the tires, brakes and headlights of the car were in good condition. Proceeding along this cement road at twenty-five to thirty miles per hour, the driver noticed, when within about three hundred feet of the place of the accident, that the road was slippery, and so reduced the speed to fifteen miles. Continuing another one hundred feet on the right-hand side of the road, the car began to skid on the icy surface of the road so the driver could not control it, and it swung north, then west, and almost completely around, and went through an opening in the fence, tipping the car over and breaking two fence posts with the sections of rail attached, at a point just north of that where another car had skidded into and broken the fence that afternoon. The decedent's car went down a thirty-four foot bank into the Naugatuck River, causing the death of the decedent by drowning. About a half hour later another car skidded on the ice and went through the same opening into the river and came to rest directly in front of the car of the decedent. The cement roadway at this point was twenty-one feet eleven inches wide, with a shoulder on each side. A high hill was on the east side, which sloped to the west, and the cutting of the road made a tall perpendicular cliff of rocks on the east, while on the west was a steep bank running sharply down to the surface of the water. The road at and near this point curves east, then west, then east again around the cliff at a slight upgrade and then descends a considerable distance at a slight grade. At this point and in the immediate vicinity, the roadway was more frequently icy than at other points, owing to the conditions existing there. With all this the defendant's servants and agents were familiar.

For about three years and on the night in question, the only barrier between the roadway and the river was a fence, which at this point was two feet seven

inches west of the westerly edge of the cement. This fence was of wooden posts six to eight inches in diameter, set in the ground eight feet apart, with a forty-five degree cut at the top to which was nailed a two by six inch wooden rail sixteen feet long, and another rail of the same size was nailed to the posts halfway between the upper rail and the ground. This was the type of highway fence then in general use in this State. It was not strong enough to withstand the impact of a car like that of the decedent going fifteen miles per hour, or a quiescent load of one thousand pounds. On the day in question a light rain or mist fell during the afternoon and evening, making the surface of the roadway wet, but ice did not form except at the depression in question and at others of a similar sort on other portions of the road. This road and fence were in charge of a foreman whose duty it was to see that both were kept in the condition required by law. This foreman and his assistants were aware of the susceptibility to ice of this particular depression in the roadway and they knew that it was in that condition on the day in question. Early in the evening and between three and seven o'clock they sprinkled sand and cinders on this ice from a moving truck on at least two occasions, but ice gradually formed on top of these applications. About fifty automobiles were stalled and several minor collisions occurred during that afternoon and evening at this point. About four o'clock an automobile skidded slowly, out of control, for one thousand feet, against this fence, making an opening about sixteen feet wide, but caught and held on the top of the bank and did not go into the river. About half-past seven another car, equipped with tire chains and going about seven miles per hour, attempted to stop but skidded, out of control, into a cement wall which was about one hundred feet south of the break. The de-

fendant's foreman, with his men and trucks, were some or all present at this point on four occasions between five and eleven o'clock that evening, but made no effort to repair the fence until the morning after the decedent's accident. In the meantime the place remained as it had theretofore been, unguarded, unlighted and unprotected by any light or signal whatsoever.

Upon the facts outlined above, the court reached the conclusions that neither the decedent nor her driver were in any way negligent, but that the skidding was caused by the conformation of the surface of the road and its icy condition; that this portion of the roadway was so raised above the adjoining ground on the west as to render it unsafe for travel unless its westerly side was protected by a sufficient fence or railing as required by law; that at the time the decedent's car approached this spot sixteen feet of fence was practically gone and the portion remaining next north was of such type and construction as to be insufficient to protect travelers, and that these conditions at that time and place rendered the highway defective and dangerous, and that the default of the defendant's servants and agents in this connection was the proximate cause of the decedent's injury and death.

Each and all the conclusions of the trial court are assigned as errors, but we direct our attention to the two issues which seem to us to be controlling on this appeal.

The plaintiff claimed that the defendant's liability arose from a failure to conform to the requirements of §§ 1413 and 1414 of the General Statutes and § 47 of Chapter 263 of the Public Acts of 1925, the pertinent provisions of which are as follows: "The party bound to maintain any bridge or road shall erect and maintain a sufficient railing or fence on the side of such bridge, and of such parts of such road as are so made or raised

above the adjoining ground as to be unsafe for travel; and whoever shall suffer damage in his person or property by reason of the want of any such railing or fence may recover damages from such party." General Statutes, § 1413. "Any person injured in person or property by means of a defective road or bridge may recover damages from the party bound to keep it in repair. . . ." General Statutes, § 1414. "Any person injured in person or property through the neglect or default of the State or any of its employees by means of any defective road or bridge which it is the duty of the highway commissioner to keep in repair, or by reason of the lack of any railing or fence on the side of such bridge or that part of such road which may be raised above the adjoining ground so as to be unsafe for travel, which railing or fence it shall be the duty of said highway commissioner to maintain, . . . may bring a civil action to recover damages sustained thereby against the highway commissioner. . . ." Public Acts of 1925, Chap. 263, § 47. In § 28 of the Act of 1925 it is provided, save in one particular not relevant to the present inquiry, that the highway commissioner shall have "exclusive jurisdiction over all highways laid out, constructed, reconstructed or maintained by him, and shall have the same powers relating to the trunk line and State aid system of highways as are given to the selectmen of towns," and § 30 of the same Act reads that, except as otherwise provided by law, these roads "shall be maintained by the highway commissioner." The intent and effect of this legislation was to impose upon the highway commissioner, as the representative of the State, as respects highways taken over by it, the same duties and burdens theretofore laid upon the towns. *Perrotti* v. *Bennett,* 94 Conn. 533, 109 Atl. 890; *Horton* v. *Macdonald,* 105 Conn. 356, 135 Atl. 422. These

duties included the requirement, contained in § 1413 of the General Statutes, that "the party bound to maintain any bridge or road shall erect and maintain a sufficient railing or fence on the side of such bridge, and of such parts of such road as are so made or raised above the adjoining ground as to be unsafe for travel." Since, unless expressly authorized, no action at law lies against a sovereign State, the further provision of § 1413—"whoever shall suffer damage in his person or property by reason of the want of any such railing or fence may recover damages from such party"—afforded such person no right of action at law for damages so suffered upon State highways, and his only recourse was a claim against the State presented to the General Assembly. In 1915 an Act was passed (Chapter 307) which was the original predecessor of § 47 of Chapter 263 of the Public Acts of 1925, and is identical with it as to the provisions which are significant in the present inquiry. It afforded, as an alternative to resort to the legislature, an opportunity for a determination, by the courts, of such claims as were within its scope and purview, subject to certain limitations, not here involved, and to that extent constituted, as against the State, a substitute for the right of action against municipalities conferred by §§ 1413 and 1414 of the General Statutes for defects in highways and for failure to fulfil the duty of maintaining railings or fences imposed by § 1413.

Obviously the Act of 1925 and its predecessors had reference to the railing or fence mentioned in that part of § 1413 which imposes the duty to maintain them, to wit, one which is "sufficient." There is nothing in the language of the Act to indicate, as the appellant contends, that it was the intent of the legislature thereby to place less burden upon the State than that imposed upon municipalities by the general statute, in that it is required to maintain only such a railing or

fence as will serve as a warning or guide to the traveler. It does not differ in any significant respect from that portion of § 1413 which gives a right of action against municipalities, and no more qualifies or affects the duty of the party bound to maintain the highway, railing, or fence.

Neither can we accept the view that the intent of the legislature in requiring, in § 1413 of the General Statutes, a sufficient fence or railing is satisfied by the provision of one which is adequate merely "to serve as a continuous warning or guide." We must assume that it intended a fence or railing sufficient for the purpose for which it was required and placed. An examination of the statute shows what that purpose was. The fence is required at those points where the road, because of being raised above the adjoining ground, is unsafe. Its obvious purpose was to make the road reasonably safe. Any road which is not reasonably safe for the reasonable use of the traveling public is defective. Reasonable safety is the universal standard prescribed for our public highways. This excludes the idea of a mere guide such as might be required at a curve or corner in the road, and requires a barrier, because of the danger of going off the bridge or raised roadway. It does not require an impregnable barrier, one sufficient to withstand any force which may be exerted against it, for that would be to virtually insure the traveler and for this there is no warrant. As in all other situations, the safeguard must be proportioned to the danger. It would be to impute a well-nigh meaningless intent to the legislature to say that a single rail, say one inch in diameter, along the side of a bridge or roadway would always conform to the legislative intent. We interpret the statute as requiring that where, for the reasons stated, the road is unsafe, a railing or fence should be maintained of such character as to make the road rea-

sonably safe for the reasonable use of the traveling public, under the circumstances. The important question presented to us therefore is whether, under the present circumstances, this road was so protected.

We do not understand any claim to be made, or the trial court to have held, that the ice alone rendered this highway defective. It is not disputed that the ice was there and that the decedent's car and many others were put out of control more or less completely by it. The trial court held that to be an incident of travel, but reached the conclusion that the highway at this point was defective because there was not a fence sufficient to furnish "a reasonably proper kind or degree of protection," and that, for an unreasonable length of time, there was no protection whatever by any fence at the point where the decedent's car went into the river.

It is not unreasonable to hold that two rails but two inches thick, nailed to posts six to eight inches in diameter, which could not withstand a quiescent load of one thousand pounds, was insufficient to render reasonably safe this extremely dangerous place in the highway with its curves and contour and its peculiar susceptibility to ice. Much support is given to this conclusion by the events of the afternoon and evening in question. It is not unreasonable to hold that from this insufficiency and since the fence was broken in the afternoon, the road was not reasonably safe for travel, and with knowledge of this condition it had been left as it was until the following morning, and was therefore defective within the meaning of the law we are considering. Nor is it, we think, unreasonable to hold that the defendant's servants and agents, with actual knowledge of these dangerous conditions, failed in the reasonable performance of their duty in allowing the conditions to remain as they were and leaving the break in the fence without any warning signs or lights,

before the decedent's accident occurred. The conclusions of the trial court in this regard must be sustained, and since this is so, it is unnecesary to discuss other assignments of error, since none of them could affect the result.

There is no error.

In this opinion the other judges concurred.